# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

TIMOTHY G. MARTIN )  3:16-CV-00933 (KAD)
     *Plaintiff*, )
 )
      v. )
 )
TOWN OF SIMSBURY, et al., )
     *Defendants*. )  December 7, 2020

## MEMORANDUM OF DECISION RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 147)

Kari A. Dooley, United States District Judge

This action arises out of *pro se* Plaintiff Timothy Martin's unsuccessful effort to build a single-family residence on a parcel of land in Simsbury, Connecticut. The Defendants include the Town of Simsbury (the "Town"), Town employees and certain members of both the Zoning Board and the Conservation Commission. Plaintiff alleges that Defendants, through a series of administrative or regulatory actions, thwarted his development of the land in violation of his Fifth and Fourteenth Amendment rights under the United States Constitution and state law. Pending before the Court is Defendants' motion for summary judgment. For the reasons that follow, the Defendants' motion for summary judgment is GRANTED.

## Procedural Background

Plaintiff commenced this action on June 15, 2016 against the Town and other Town officials alleging various federal constitutional claims under sections 1983, 1985, and 1988 of title 42 of the United States Code, as well as various state law claims. By motion dated September 15, 2016, each Defendant sought dismissal of the case on a variety of bases, to include questions of subject matter jurisdiction, as well as claims that the Plaintiff had failed to state a claim upon which relief might be granted. (ECF No. 25). The omnibus motion was granted by the Court (Hall, J.) on

May 2, 2017 on the limited issue of ripeness. (ECF No. 58). The other issues raised in the motion to dismiss were not addressed in the Court's decision.

The Plaintiff appealed the decision to the Second Circuit Court of Appeals, which vacated the decision and remanded the case for further proceedings on May 29, 2018. (ECF No. 67). On remand, the Defendants again moved to dismiss the complaint raising the issues that were not previously decided. (ECF No. 83). At the conclusion of the hearing on the Motion to Dismiss, the Court granted the motion, in part, dismissing the Equal Protection[1] and Due Process claims in Count One[2]; dismissing the Supervisory Liability claims in Count Two, to the extent those claims were premised upon the Equal Protection or Due Process claims dismissed from Count One; dismissing the conspiracy claims contained in Count Three; dismissing the Intentional Infliction of Emotional Distress claim in Count Four; dismissing the Negligence and Negligent Infliction of Emotional Distress claims in Counts Five and Six. The Court reserved decision on the motion with respect to the Inverse Condemnation claim in Count Seven, the Fifth Amendment Regulatory Taking claim in Count One, and the Supervisory Liability claim in Count Two, to the extent the claim was premised upon the Fifth Amendment Regulatory Taking claim in Count One.

Separately, the Court also took up the issue of whether the claims against Defendant Howard Beach should be dismissed for failure to effect service, and whether the Plaintiff should be given more time to do so. By Order dated June 19, 2019, all remaining claims against Defendant Beach were dismissed. (ECF No. 136). On August 28, 2019, the Court rendered its decision on the motion to dismiss denying the motion as to the Takings claims in Counts One and Two and denying

---

[1] The dismissal of the Equal Protection claim was without prejudice to Plaintiff repleading the claim to identify comparators for purposes of his "class of one" theory of liability.

[2] Count One, brought pursuant to Section 1983, included multiple theories of liability. It included an alleged procedural and substantive violations of the Due Process Clause of the Fourteenth Amendment; violations of the Equal Protection Clause of the Fourteenth Amendment and violations of the Takings Clause of the Fifth Amendment.

the motion as to the Inverse Condemnation claim brought under Article First, Section 11 of the Connecticut Constitution in Count Seven. (ECF No. 139).

Thereafter, on September 26, 2019, Plaintiff filed the operative amended complaint in which he, among other things, identified a comparator to revive his Equal Protection claim and the Supervisory Liability claim to the extent it is premised upon the Equal Protection claim. On December 30, 2019, Defendants filed the instant motion for summary judgment seeking judgment, on various grounds, as to all remaining claims. Plaintiff filed his opposition on February 18, 2020 and Defendants filed their reply on March 9, 2020.

**Standard of Review**

The standard under which the Court reviews motions for summary judgment is well-established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," while a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Significantly, the inquiry conducted by the Court when reviewing a motion for summary judgment focuses on "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id*. at 250. As a result, the moving party satisfies his burden under Rule 56 "by showing . . . that there is an absence of evidence to support the nonmoving party's case" at trial. *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (*per curiam*) (internal quotation marks omitted). Once the movant meets its burden, "[t]he

nonmoving party must set forth specific facts showing that there is a genuine issue for trial[.]" *Irizarry v. Catsimatidis*, 722 F.3d 99, 103 n.2 (2d Cir. 2013) (quoting *Rubens v. Mason*, 527 F.3d 252, 254 (2d Cir. 2008)). "[T]he party opposing summary judgment may not merely rest on the allegations or denials of his pleading" to establish the existence of a disputed fact. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009); *accord Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted; internal quotation marks omitted). Nor will wholly implausible claims or bald assertions that are unsupported by evidence. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). "In deciding a motion for summary judgment, the district court's function is not to weigh the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could find in favor of the non-moving party." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002).

**Facts**

As a preliminary matter, the Court addresses Plaintiff's non-compliance with Local Rule 56(a). Local Rule 56 governs the requirements for summary judgment motions in this district. It provides in pertinent part:

> 1. A party moving for summary judgment shall file and serve with the motion and supporting memorandum a document entitled "Local Rule 56(a)1 Statement of Undisputed Material Facts," which sets forth, in separately numbered paragraphs meeting the requirements of Local Rule 56(a)3, a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried. . . . Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule[.]

> 2. (i) A party opposing a motion for summary judgment shall file and serve with the opposition papers a document entitled "Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment," which shall include a reproduction of each numbered paragraph in the moving party's Local Rule 56 (a)1 Statement followed by a response to each paragraph admitting or denying the fact and/or objecting to the fact as permitted by Federal Rule of Civil Procedure 56(c). . . . All admissions and denials shall be binding solely for purposes of the motion unless otherwise specified. All denials must meet the requirements of Local Rule 56(a)3. . . . .

> (ii) The Local Rule 56(a)2 Statement must also include a separate section entitled "Additional Material Facts" setting forth in separately numbered paragraphs meeting the requirements of Local Rule 56(a)3 any additional facts, not previously set forth in responding to the movant's Local Rule 56(a)1 Statement, that the party opposing summary judgment contends establish genuine issues of material fact precluding judgment in favor of the moving party. . . . .

> 3. Each statement of material fact by a movant in a Local Rule 56(a)1 Statement or by an opponent in a Local Rule 56(a)2 Statement, and each denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial. The affidavits, deposition testimony, responses to discovery requests, or other documents containing such evidence shall be filed and served with the Local Rule 56(a)1 and (a)2 Statements in conformity with Fed. R. Civ. P. 56(e). The "specific citation" obligation of this Local Rule requires parties to cite to specific paragraphs when citing to affidavits or responses to discovery requests and to cite to specific pages when citing to deposition or other transcripts or to documents longer than a single page in length. Failure to provide specific citations to evidence in the record as required by this Local Rule may result

in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1, or in the Court imposing sanctions, including, when the movant fails to comply, an order denying the motion for summary judgment, and when the opponent fails to comply, an order granting the motion if the motion and supporting materials show that the movant is entitled to judgment as a matter of law.

D. CONN. L. CIV. R. 56(a). Generally, when a party fails to appropriately deny facts set forth in the movant's Local Rule 56(a)(1) Statement, those facts are deemed admitted. *See Shetucket Plumbing Supply Inc. v. S.C.S. Agency, Inc.*, 570 F.Supp.2d 282, 283 n.1 (D. Conn. 2008) (facts "deemed admitted because they have not been squarely denied with specific citation to evidence in the record as Local Rule 56(a)(3) requires."); FED. R. CIV. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion[.]"); D. CONN. L. CIV. R. 56(a)(3) ("Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence[.]"). Further, Rule 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute." *S.E.C. v. Glob. Telecom Servs., L.L.C.*, 325 F.Supp.2d 94, 109 (D. Conn. 2004).

Here, Plaintiff's Rule 56(a)(2) Statement of Facts in Opposition to Summary Judgment does not comply with Local Rule 56(a) in multiple significant respects.[3] First, on many occasions, in response to Defendants' Local Rule 56(a)(1) Statement, although denying a particular fact asserted by the Defendants, Plaintiff fails to cite to the record in support of the denial.[4] *See, e.g.*,

---

[3] Pursuant to Local Rule 56(b), Defendants filed and served on *pro se* Plaintiff the required notice regarding summary judgment. (*See* ECF No. 147-22). Thereby, Plaintiff was on notice of these rules and of the consequences for failing to comply with them.

[4] Nor did Plaintiff file an "Additional Material Facts" section "setting forth . . . any additional facts . . . that the party opposing summary judgment contends establish genuine issues of material fact precluding judgment in favor of the moving party." D. CONN. L. CIV. R. 56(a)(2)(ii).

ECF No. 151-1 ¶ 35. The "fact" asserted in paragraph 35 was the content of an April 20, 2015 memorandum. Plaintiff does not admit or deny whether the memorandum is accurately described. Rather, he denies the content of the memorandum without any citation to the record. This approach completely defeats the purpose of the Local Rule 56(a)(2) statement. Additionally, many of Plaintiff's responses are replete with argument, legal conclusions, personal belief, and speculation, which is inappropriate. *See* D. CONN. L. CIV. R. 56(a)(3); *see also Risco v. McHugh*, 868 F.Supp.2d 75, 85 n.2 (S.D.N.Y. 2012) ("the Statement improperly interjects arguments and/or immaterial facts in response to facts asserted by Defendant, without specifically controverting those facts"); *Costello v. New York State Nurses Ass'n*, 783 F.Supp.2d 656, 661 n.5 (S.D.N.Y. 2011) (disregarding plaintiff's responses to defendant's Rule 56(1) statement where plaintiff responded with conclusory allegations or legal arguments); *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996) ("mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment"); *Kuck v. Danaher*, No. 3:07CV1390 VLB, 2012 WL 4904387, at *7 (D. Conn. Oct. 16, 2012), *aff'd sub nom. Kuck v. Masek*, 542 F. App'x 75 (2d Cir. 2013) ("It is axiomatic that a party must present facts not legal conclusions, personal belief, or speculation couched as facts to survive summary judgment."); (*see, e.g.*, ECF No. 151-1 ¶ 55 (speculating and arguing that the Town's former Code Compliance Officer "had no authority to sign off as to wetlands" regarding Plaintiff's neighbor's project)). Moreover, in one instance, Plaintiff cites to an allegation in his Second Amended Complaint even though such allegations are not evidence, *Welch-Rubin v. Sandals Corp.*, No. 3:03CV481 (MRK), 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004), and cannot be relied upon to defeat a motion for summary judgment, *Gottlieb v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). Under these circumstances, to the extent Plaintiff's Local Rule 56(a)(2) Statement does not comply with Local Rule 56(a)(3), the Court will deem "admitted

certain facts [within Defendants' Local Rule 56(a)(1) Statement] that are supported by the evidence in accordance with Local Rule 56(a)(1)" for the purposes of resolving this motion. D. CONN. L. CIV. R. 56(a)(3).

Therefore, unless otherwise noted, the following facts are either expressly undisputed or deemed admitted by the Plaintiff's failure to comply with Local Rule 56(a)(3). *See Miron v. Town of Stratford*, 976 F. Supp. 2d 120, 127 (D. Conn. 2013) ("Where a party fails to appropriately deny material facts set forth in the moving party's 56(a)1 statement, and where those facts are supported by evidence in the record, those facts are deemed to be admitted.").

Plaintiff owns land located on Lark Road in Simsbury, Connecticut (the "Property"). (ECF No. 147-2 ¶ 1). The Property is 2.86 acres and was previously part of a larger parcel located at 9 Dogwood Lane. (*Id*. ¶ 2). It is located in an R-40 zone and, according to the Town's zoning regulations, 200 feet of frontage on an approved road is required before buildings or structures may be erected or altered on the land. (*Id*. ¶¶ 2–3).

**Pre-ownership of the Property**

Prior to Plaintiff's ownership of the Property and its creation as a separate lot, Plaintiff learned about the 9 Dogwood Lane property in the fall of 2011. (*Id*. ¶ 4). Around then, Plaintiff met with Howard Beach, the Town's Zoning Compliance Officer at the time, who confirmed that 9 Dogwood Lane qualified for a free split. (*Id*.). At the meeting, according to Plaintiff, Beach reviewed the Town's inland wetlands map and told Plaintiff that (1) there were no wetlands on or near 9 Dogwood Lane, (2) Plaintiff would not have to attend a wetlands meeting and (3) Plaintiff would not have to conduct any wetlands investigation. (*Id*. ¶ 5). However, Beach did not state in writing that 9 Dogwood Lane was exempt from the wetlands' requirements. (*Id*.). Further, regarding the lot Plaintiff proposed to create on the Lark Road side of 9 Dogwood Lane through

the free split, Beach noted that the lot needed to have 200 feet of frontage on an approved road. (*Id*. ¶ 6). According to Plaintiff, Beach told Plaintiff that his proposal needed to include a road and that Beach would approve the road with Plaintiff's map effecting the split. (*Id*.). Also, according to Plaintiff, Beach did not tell Plaintiff whether there was an additional process for getting the road approved or built. (*Id*. ¶ 7). At that time, Plaintiff did not consult with the Town's zoning regulations to determine the road approval requirements. (*Id*.).

Thereafter, on September 23, 2011, Beach sent Plaintiff a letter confirming that 9 Dogwood Lane was entitled to a free split. (*Id*. ¶ 8). Therein, Beach advised Plaintiff that the newly proposed lot, which would later become the Property, needed to meet various requirements to become a building lot. (*Id*. ¶ 9). Among other requirements, the proposed lot needed to have "the required 200-feet of frontage on an 'approved road'" and Plaintiff needed to file a map with the "Town Clerk showing the proposed lot configuration[.]" (*Id*.).

**Ownership of the Property**

On December 2, 2011, Dauntless Construction, a limited liability company of which Plaintiff was the only member, acquired 9 Dogwood Lane. (*Id*. ¶ 10). Thereafter, around February 24, 2012, Plaintiff presented his division plan for 9 Dogwood Lane, known as Map #3976, to Beach, who initialed the map before it was filed with the Town's land records. (*Id*. ¶¶ 11–12).[5] According to Beach, he initialed Map #3976 to indicate that it had been received before its filing, not to indicate approval of a building lot. (*Id*. ¶ 12). Indeed, Beach did not describe the Property to Plaintiff as an "approved building lot" verbally or in any correspondence. (*Id*.). In any event, it is undisputed that the filing of Map #3976 created the Property at issue in this case.

---

[5] There appears to be a dispute as to whether Beach was involved in the preparation of Map #3976. Defendants claim that Beach was not involved in its preparation (ECF No. 147-2 ¶ 11), whereas Plaintiff claims that Beach was involved (ECF No. 151-1 ¶ 11).

### Road Frontage Issue

Map #3976 depicts a proposed street extension for frontage purposes, indicating Plaintiff's intention to create frontage for the Property by creating a legal right-of-way extending westerly from Lark Road for 200 feet. (*Id.* ¶ 13). However, the filing of Map #3976 did not establish the right-of-way and Plaintiff did not file a map or deed to create the right-of-way. (*Id.*). According to Plaintiff, after Beach initialed Map #3976, Beach said, "I don't know if they're going to make you build it, but you've got a road[.]" (*Id.* ¶ 14). Thus, Plaintiff maintains that Beach's word, his initialing of Map #3976, and its filing in the Town's land records constituted approval of the road thereby giving the Property the necessary frontage. (*Id.* ¶ 15). However, according to Beach, Beach neither told Plaintiff that he had a road nor implied that the filing of Map #3976 created a building lot. (*Id.* ¶ 14).

### Wetlands Issue

On January 17, 2014, Town Engineer, Richard Sawitzke, P.E., sent Beach a memorandum regarding hydrology issues at the Property. (*Id.* ¶ 16). Sawitzke noted that the Property had "extremely high ground water and, seasonally, surface water" and that "more detailed elevation information [was] needed on existing drainage facilities in order to demonstrate that site drainage is designed to protect not only the new home, but adjacent neighboring properties." (*Id.*; ECF No. 147-7 at 11). Accordingly, Sawitzke concluded that Plaintiff "may have to devote more engineering effort than might normally be expected in order to have a successful outcome for this lots development." (ECF No. 147-7 at 11).

Subsequently, on January 30, 2014, Beach sent Plaintiff a letter regarding the hydrology issues raised by Sawitzke. (ECF No. 147-2 ¶ 17; ECF No. 147-7 at 13). Therein, Beach noted that, although the Town's official inland wetlands map did not show wetlands on the Property, the

state's wetlands mapping indicated that there were significant amounts of wetlands on the portion of the Property where the Plaintiff proposed to build the house. (*Id.*). Accordingly, Beach advised Plaintiff that "any home constructed after 1987 is subject to wetlands law, and the soils on the [Property] must be investigated before [he] can sign off on the building permit[.]" (ECF No. 147-2 ¶ 21; ECF No. 147-7 at 13). Specifically, Beach indicated that "no construction can be approved on the [Property] until [the Town received] . . . [w]etlands mapping for the site with [an] accompanying soils report." (*Id.*).

### Permit Application and Variance Request

On February 26, 2015, Plaintiff applied for a permit to construct a "foundation" at the Property. (ECF No. 147-2 ¶ 23).[6] Before Plaintiff filed the permit application, Beach retired and Michael Glidden became the Town's Zoning Enforcement Officer. (*Id.* ¶ 24). On March 4, 2015, after reviewing the application, Glidden sent Plaintiff a letter notifying him that the application could not be approved at that time. (*Id.* ¶ 25). First, Glidden noted that the Property did not meet the frontage requirement and that Plaintiff needed to bring the Property into compliance with the zoning regulations to proceed with the development. (*Id.*). Next, Glidden noted that test pit data and state soil mapping indicated that wetlands soils were present on the Property and that, therefore, the development required approval by the Conservation Commission. (*Id.* ¶ 26). Accordingly, Glidden recommended that a soil scientist investigate and delineate the extent of wetlands soils on the Property. (*Id.*). After investigation, Glidden stated that Plaintiff's site plan would need to be updated to reflect the extent of wetlands soils present in relation to the proximity of the development. (*Id.*).[7] Lastly, Glidden expressed his concern regarding Plaintiff's grading plan

---

[6] In late February 2015, Dauntless Construction transferred the Property to Plaintiff by quitclaim deed. (ECF No. 147-2 ¶ 22). Dauntless Construction, however, retained ownership of 9 Dogwood Lane until April 25, 2016, when it sold 9 Dogwood Lane to third-party purchasers. (*Id.* ¶ 23).

[7] Glidden kept notes regarding his concerns of wetlands soils on the Property as early as January 8, 2014. (*Id.* ¶ 27).

insofar as it had the potential to negatively alter existing drainage patterns. (*Id*. ¶ 28). In conclusion, Glidden warned Plaintiff that he needed to respond to the letter with a plan of compliance within thirty days or the application would be denied. (*Id*. ¶ 29).

On March 7, 2015, Plaintiff responded to Glidden's letter. (*Id*. ¶ 30). In his response, Plaintiff claimed that Beach designed, approved, and signed Map #3976 "thereby approving the road which gives the lot its 200 feet of required frontage." (*Id*.; ECF No. 147-11 at 2). Plaintiff also noted that, for various reasons, he did "not plan on doing any wetlands investigation on [the Property]." (ECF No. 147-11 at 3). Lastly, Plaintiff asserted that Glidden's "opinion on the drainage plan means little to nothing." (*Id*.). Additionally, on March 20, 2015, Plaintiff wrote to the Conservation Commission noting that he did "not plan on doing any wetlands investigation on [the Property.]" (ECF No. 147-12 at 13). Indeed, Plaintiff never retained a soil scientist to test the Property for wetlands soils. (ECF No. 147-2 ¶ 32).

Consequently, in an April 6, 2015 letter, Glidden denied Plaintiff's permit application noting that his concerns had not been adequately addressed and that his office had not received sufficient documentation to determine compliance with zoning regulations. (*Id*. ¶ 33). Prior to receiving that letter however, on April 1, 2015, Plaintiff had appealed the determinations in Glidden's March 4, 2015 letter to the Town's Zoning Board of Appeals. (*Id*. ¶ 34). In connection with the appeal, on April 20, 2015, Hiram Peck, the Town Planner, submitted a memorandum to the ZBA regarding Glidden's denial of Plaintiff's application and the determinations made by Glidden in his March 2015 letter. (*Id*. ¶ 35). The ZBA heard the appeal on April 22, 2015. (*Id.* ¶ 37). Before the hearing, the ZBA received letters from neighboring property owners expressing their concerns regarding Plaintiff's proposed development of the Property. (*Id*.). Another neighbor spoke at the hearing to express his concerns regarding the Property's wetness and the potential

increase in the amount of impervious surface on the Property. (*Id*.). At the end of the hearing, the ZBA denied Plaintiff's appeal because of his failure to satisfy the frontage requirement and to obtain wetlands permits, among other reasons. (*Id*. ¶ 38). Thereafter, Plaintiff appealed the ZBA's decision to the Superior Court of Connecticut. (*Id*. ¶ 39). On December 2, 2015, the court denied Plaintiff's appeal and, specifically, affirmed the ZBA's conclusion that Beach's initialing of Map #3976 did not indicate Town approval of the Property as a building lot. (*Id*.).

While the appeal was pending, on August 4, 2015, Plaintiff applied for a variance from the Town's zoning regulations with respect to the frontage requirement. (*Id*. ¶ 40). In connection with Plaintiff's request for a variance, on August 11, 2015, Glidden submitted comments to the ZBA noting that the Plaintiff's hardship was self-imposed because it was Plaintiff's splitting of 9 Dogwood Lane that created the need for the variance. (*Id*. ¶ 41). Glidden further noted that there were alternative reasonable uses for the Property, including selling portions or the entire Property to abutting property owners or recombining the Property with 9 Dogwood Lane. (*Id*.). Glidden advised the ZBA that if combined with 9 Dogwood Lane, Plaintiff would be able to build an accessory structure like a swimming pool or a tennis court on the Property. (*Id*.).[8] Ultimately, on August 26, 2015, the ZBA denied Plaintiff's application for a variance. (*Id*. ¶ 43).

Separately, Plaintiff brought an action in the Connecticut Superior Court purporting to be an appeal from the Conservation Commission regarding Glidden's March 2015 letter with respect to the wetlands issue. (*Id*. ¶ 44). On January 26, 2016, the court dismissed the action upon finding that Plaintiff failed to exhaust his administrative remedies as provided by the Town's Inland Wetlands and Watercourses Regulations. (*Id*.).

---

[8] At that time, Dauntless Construction still owned 9 Dogwood Lane.

Thereafter, on April 11, 2016, Plaintiff sent the Town a request in which he asked the Conservation Commission to "make a determination as to whether the [Property] can be regulated by [the Commission] as to wetlands under the law[.]" (ECF No. 147-19 at 5). Plaintiff specifically noted that he was "not asking [the Commission] to make a determination as [to] whether wetlands soils exist on or near [the Property.]" (*Id*.). On June 21, 2016, the Commission voted to acknowledge receipt of the request and to consider any application submitted to the Commission regarding the Property in the context of everything else that had been received. (ECF No. 147-2 ¶ 47). According to Commissioner Darren Cunningham, Plaintiff's "next logical step" would be to submit an application to the Commission, as "advisory opinions are not typically provided." (ECF No. 147-20 at 4). Plaintiff did not thereafter submit any application to the Commission.

Just before the Commission's vote regarding Plaintiff's April 11, 2016 letter seeking the Commission's view as to its legal authority, Plaintiff filed the instant action.

**Discussion**

### Count One—Regulatory Taking

The precise factual basis for the Plaintiff's takings claim is unclear. Plaintiff appears to assert that the Town effectuated a taking of the Property without just compensation through a combination of actions: the rejection of his claim that Map #3976 established an approved building lot; the use of the state wetlands map to require approval from the Commission; denial of his permit to build a foundation; the ZBA's subsequent affirmance of that denial; and the ZBA's denial of his application for a variance. (ECF No. 141 ¶ 51). "The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, prohibits the government from taking private property for public use without just compensation." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) (internal citation omitted). Although the "clearest sort of taking occurs when the

government encroaches upon or occupies private land for its own proposed use," the Supreme Court has "recognized that there will be instances when government actions do not encroach upon or occupy the property yet still affect and limit its use to such an extent that a taking occurs." *Id.* Such actions are referred to as regulatory takings. *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942 (2017). There are two types of regulatory takings: categorical and non-categorical. *Sherman v. Town of Chester*, 752 F.3d 554, 564 (2d Cir. 2014). "A categorical taking occurs in 'the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted.'" *Id.* (citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330 (2002)). Alternatively, "when a regulation impedes the use of property without depriving the owner of all economically beneficial use, a [non-categorical taking] may be found based on a complex of factors, including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr*, 137 S. Ct. at 1943 (internal quotation marks omitted).

### Categorical Taking

Defendants assert that the undisputed facts as set forth above would preclude any reasonable jury from concluding that Plaintiff's property had "*no* productive or economically beneficial use," *Sherman*, 752 F.3d at 564 (citing *Tahoe Reg'l Planning Agency*, 535 U.S. at 330), as a result of the zoning regulations and Defendants' conduct in enforcing those regulations. To the contrary, Defendants argue that the Property indisputably retained value and economically beneficial use.

In response, Plaintiff argues that his situation is akin to that presented in *Lucas v. S.C. Coastal Council*. 505 U.S. 1003 (1992).[9] There, after the plaintiff-developer purchased two

---

[9] Plaintiff, in relying on *Lucas*, appears to assert only a categorical taking. The Court nonetheless will consider the complaint as alleging both a categorical and non-categorical taking.

beachfront lots in order to develop single-family homes, the South Carolina legislature passed the Beachfront Management Act, which prevented "the erection of any habitable or productive improvements" on the land and, according to the state trial court, rendered the land valueless. *Id.* at 1006–07, 1031. In the state court proceedings, the South Carolina Supreme Court ultimately found that "no compensation is owing under the Takings Clause regardless of the regulation's effect on the property's value" because the Beachfront Management Act was "a regulation respecting the use of property designed to prevent serious public harm[.]" *Id.* at 1010 (internal quotation marks omitted). The Supreme Court reversed and remanded the case directing the South Carolina courts to find a regulatory taking unless "background principles of nuisance and property law . . . prohibit the uses [plaintiff] now intends in the circumstances in which the property is presently found" because, in that case, the Beachfront Management Act would be taking nothing. *Id.* at 1031–32. Thus, the Supreme Court affirmed its "frequently expressed belief that when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." *Id.* at 1019 (emphasis in original).

The Court agrees with the Defendants that no reasonable jury could find that a categorical taking occurred in these circumstances. Indeed, unlike the trial court's finding in *Lucas*, the Plaintiff's property has not been rendered valueless or deprived of all economically beneficial use. Despite the denial of Plaintiff's permit application and variance request, the Property still retains value—in 2019, the Property was appraised at $26,712.00. (ECF No. 147-2 ¶ 48); *Lucas*, 505 U.S. at 1019 n.8 (noting that a landowner who loses 95% of the property's value may not recover under the categorial formulation —"Takings law is full of these 'all-or-nothing' situations"). Moreover, although Plaintiff appears to argue that a taking was effectuated because he was denied the ability

to build a single-family residence, even under a non-categorical takings claim, Plaintiff cannot establish a taking "simply by showing that [he has] been denied the ability to exploit a property interest that [he] heretofore had believed was available for development[.]" *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 130 (1978). Furthermore, even though Plaintiff was not permitted to develop the Property as a rear lot subdivision, *see Martin v. Town of Simsbury*, 735 F. App'x 750, 752 (2d Cir. 2018) (summary order), Glidden identified several other economically beneficial uses of the Property. In his August 2015 comments to the ZBA regarding Plaintiff's variance request, Glidden noted that Plaintiff could sell portions or the entire Property to abutting property owners or combine the Property with 9 Dogwood Lane. (ECF No. 147-2 ¶ 41). If Plaintiff combined the Property with 9 Dogwood Lane, which was still owned by Dauntless Construction at the time, Glidden explained that Plaintiff could build an accessory structure, such as a swimming pool or a tennis court, on the Property. (*Id.*). Thus, because there is no genuine issue of material fact that the Property was not deprived of all economically beneficial use, no reasonable jury could find that a categorical taking occurred.

### *Non-Categorial Taking*[10]

As discussed above, even if the Property has not been deprived of all economically beneficial use, a non-categorical taking "may be found based on a complex of factors, including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation

---

[10] Plaintiff's opposition to the motion for summary judgment contains no analysis of whether a non-categorical taking might be found on the record evidence. The Court, therefore, considers the Plaintiff's allegations in a light most favorable to making such a claim. *See Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir. 2005) (In the pleading context, "the Rules do not require a plaintiff to plead the legal theory, facts, or elements underlying his claim. This is especially true in the case of *pro se* litigants, who cannot be expected to know all of the legal theories on which they might ultimately recover. It is enough that they allege that they were injured, and that their allegations can conceivably give rise to a viable claim[.]" (citations omitted)). Because Plaintiff asserted his takings claim under *Lucas*, it is appropriate to review his takings claim under alternative theories by which he might establish a taking.

has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr*, 137 S. Ct. at 1943 (internal quotation marks omitted). In considering these factors, the Court's inquiry is "informed by the purpose of the Takings Clause, which is to prevent the government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Palazzolo*, 533 U.S. at 617–18. Further, this inquiry "requires an intensive *ad hoc* inquiry into the circumstances of each particular case." *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 375 (2d Cir. 2006).

### Economic Impact

In considering the economic impact of the regulations on Plaintiff, the Court first observes that "it is clear that prohibition of the most profitable or beneficial use of a property will not necessitate a finding that a taking has occurred." *Sadowsky v. City of New York*, 732 F.2d 312, 317 (2d Cir. 1984). Thus, Plaintiff's inability to build a single-family residence on the Property does not, of itself, create a taking. And as discussed above, there are and were other economically beneficial uses of the Property. The Court recognizes however that there is evidence in the record that the Property's value has diminished significantly. In 2015, the Town appraised the Property at $117,768 and, in 2019, the Town appraised the Property at $26,712. (ECF No. 147-2 ¶ 48). But courts considering the sustainability of "land-use regulations, which . . . are reasonably related to the promotion of the general welfare, uniformly reject the proposition that diminution in property value, standing alone, can establish a 'taking[.]'" *Penn Cent. Transp. Co.*, 438 U.S. at 131. As discussed *infra*, the Town's land use regulations are designed to contribute to and promote the general welfare. Accordingly, the economic impact factor, while favoring the Plaintiff in the takings analysis, does not alone demonstrate that a non-categorical taking occurred.

### *Investment-backed Expectations*

Defendants argue that the investment-backed expectations factor weighs against a finding that a regulatory taking occurred because Plaintiff's expectations were too speculative and uncertain insofar as it is unclear how much Plaintiff would have profited from developing the Property as he intended. The Court does not address this claim because the Court finds that Plaintiff's investment-backed expectations were unreasonable under the circumstances presented here. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) ("A reasonable investment-backed expectation must be more than a unilateral expectation or an abstract need." (internal quotation marks omitted)).

"The purpose of the investment-backed expectation requirement is to limit recovery to owners who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Allen v. Cuomo*, 100 F.3d 253, 262 (2d Cir. 1996); *Palazzolo*, 533 U.S. at 635–36 (O'Connor, J., concurring) ("Courts properly consider the effect of existing regulations under the rubric of investment-backed expectations in determining whether a compensable taking has occurred."). "Indeed, a paradigmatic regulatory taking occurs when a change in the law results in the immediate impairment of property rights, leaving the property owner no options to avoid the loss." *Meriden Tr. & Safe Deposit Co. v. F.D.I.C.*, 62 F.3d 449, 454 (2d Cir. 1995).

Here, there was no change in the law that resulted in the impairment of Plaintiff's property rights. Rather, it appears that Plaintiff is simply frustrated by the Defendants' application of existing regulations to his Property when refusing to grant him a variance or approve his permit application. There is no dispute that the frontage requirement existed at the time he acquired the Property and that he was fully aware of the frontage requirement. Rather, Plaintiff alleges that

Beach's initialing of Map #3976 and its subsequent filing in the Town's records created an approved building lot with the necessary frontage. But this assertion was specifically rejected by the Superior Court in Plaintiff's appeal of the denial of his permit application. Therein, the court specifically affirmed the ZBA's conclusion that Beach's initialing of Map #3976 did not indicate Town approval of the Property as a building lot. (ECF No. 147-2 ¶ 39). Therefore, Plaintiff's expectations regarding satisfaction of the frontage requirement were not reasonable and the Defendants rejection of this expectation, approved by the Superior Court, does not give rise to a taking. *See Ruckelshaus*, 467 U.S. at 1005.

Similarly, it is undisputed that the wetlands regulations were in effect when the Plaintiff purchased the Property and he does not argue to the contrary. The record is clear therefore that Plaintiff did not purchase the Property "in reliance on a state of affairs that did not include the challenged regulatory regime." *Allen*, 100 F.3d at 262. Rather, Plaintiff alleges that the wetlands regulations do not apply to the Property because, among other reasons, Defendants relied on a state map, as opposed to a town map, to determine that the Property contained wetlands. Even if Plaintiff is correct, he never appropriately advanced this argument in the first instance to the Conservation Commission. Indeed, he specifically refused to apply for a permit in his "appeal" to the Conservation Commission (*see* ECF No. 147-12 at 11) and, thereafter, sought only an advisory opinion as to the Commission's authority with respect to his property (*see* ECF No. 147-19 at 5). Accordingly, the Plaintiff himself is the architect of the situation in which he finds himself. And he cannot now establish a regulatory taking because there has never been a determination, based on a challenge by Plaintiff, that the wetlands regulations apply to his property.[11] (ECF No. 147-2 ¶ 44). Thus, Plaintiff bases his takings claim on his unilateral and untested expectation that the

---

[11] And it goes without saying that Plaintiff's refusal in this regard leaves unknowable whether the Commission would have granted a permit if he sought one even if it determined that the Property was subject to the wetlands regulations.

Town map controls the determination of whether wetlands are located on the Property. *See Ruckelshaus*, 467 U.S. at 1005.

For these reasons, the investment-backed expectations factor does not favor a determination that a taking occurred.

### *Character of Governmental Action*

In considering this factor, it is important to once again note that the Court's analysis is "informed by the purpose of the Takings Clause, which is to prevent the government from forcing **some people alone to bear public burdens** which, in all fairness and justice, should be borne by the public as a whole." *Palazzolo*, 533 U.S. at 617–18 (emphasis added). Thus, it is less likely for a court to find that a taking occurred "when interference [with the property] arises from some public program adjusting the benefits and burdens of economic life to promote the common good," as a opposed to when "the interference . . . can be characterized as a physical invasion by government[.]" *Penn Cent. Transp. Co.*, 438 U.S. at 124 (internal citation omitted).

Here, Defendants' interference with Plaintiff's development of the Property arises from regulations intended to promote the Town's common good. For example, one of the principal reasons the Town denied Plaintiff's permit application was the lack of adequate frontage pursuant to the Town's zoning regulations. Generally, the Town's regulations are intended "[t]o promote and to protect the public health, safety, and welfare of the inhabitants of [the Town], and of the public generally," "[t]o encourage and facilitate the orderly growth and expansion of the municipality," "[t]o prevent overcrowding on the land," and "[t]o provide adequate light, air, privacy, and convenience of access to property," among other purposes. (ECF No. 147-5 at 6). Accordingly, the regulations provide that "[n]o building . . . shall . . . be erected, constructed, reconstructed, moved, or structurally altered unless in conformity with all of the regulations herein

specified for the district in which it is located." (*Id.* at 8). More specifically, the regulations require that "[a]ll buildings or structures erected or altered . . . shall conform to the requirements specified for the zone in which the building or structure is located[,]" thereby subjecting the Property to the 200 feet frontage requirement just like all other properties located in the Town's R-40 zones. (*Id.* at 44 (table requiring properties located in an R-40 zone to have 200 feet of frontage)). Therefore, far from physically invading the Property, the Town, in order to advance the legitimate ends sought through its land use regulations, required Plaintiff to satisfy the frontage requirement before he could develop the Property.

The Town also denied Plaintiff's permit application because, as discussed above, he did not submit an application to the Conservation Commission regarding the wetlands issue. The Town's Inland Wetlands and Watercourses Regulations, like the Town's zoning regulations, seek to serve the public interest—"[t]he preservation and protection of the wetlands and watercourses from unnecessary, undesirable and unregulated uses, disturbance or destruction is in the public interest and is essential to the health, welfare and safety of the citizens of the state." (ECF No. 147-8 at 4). "[T]he purpose of these regulations [is] to protect the citizens of the state by making provisions for the protection, preservation, maintenance and use of the inland wetlands and watercourses[.]" (*Id.*). Accordingly, the regulations prevent people from conducting "a regulated activity in a regulated area of the [Town] without first obtaining a permit from the Commission." (*Id.* at 15). Even though the Plaintiff was told that he needed to seek approval from the Commission to develop the Property, (ECF No. 147-2 ¶ 26), he elected not to do so. Again, the Town did not physically invade the Property. It simply required Plaintiff to seek approval from the Commission before developing the Property in an effort to serve the public's interest regarding the protection of inland wetlands and watercourses.

22

Given that the regulations alleged to have caused the Plaintiff's harm[12] are "part of a public program adjusting the benefits and burdens of public life" and to which all landowners in the Town are subject, this factor weighs against finding a regulatory taking. *Sherman*, 752 F.3d at 565.

Based on the foregoing, no reasonable jury could find that a regulatory taking of the Plaintiff's property occurred. Therefore, the Defendants are entitled to judgment as to Plaintiff's Regulatory Taking claim.

Moreover, because the Connecticut Supreme Court applies the same analysis to inverse condemnation claims brought under the state constitution as is applied to takings claims brought under the federal constitution, Defendants are also entitled to summary judgment on Count Seven, Plaintiff's Inverse Condemnation claim. *See Cumberland Farms, Inc. v. Town of Groton*, 262 Conn. 45, 73–76 (2002) (citing both state and federal constitutional jurisprudence when discussing the nature of and proof required to establish inverse condemnation claims); *Laurel, Inc. v. State*, 169 Conn. 195, 200–01 (defining the word "taken" as used in both the Fifth Amendment to the Constitution of the United States and Article First, Section 11 of the Connecticut Constitution).

### Count One—Equal Protection

Plaintiff brings a non-class-based Equal Protection claim against the Defendants. Specifically, Plaintiff alleges that Defendants subjected him to differential treatment in comparison to his neighbors, Steven and Mary Perkins, insofar as the Perkinses were not required to perform wetlands testing or to submit an application to the Commission before constructing a barn on their property. There are two "distinct pathways for proving a non-class-based Equal Protection violation." *Hu v. City of New York*, 927 F.3d 81, 93. (2d Cir. 2019). First, under a selective treatment theory, Plaintiffs must show that "(1) the [Plaintiff], compared with others similarly

---

[12] Given Plaintiff's determination not to seek a permit from the Commission, it is difficult, if not impossible, to say that the wetlands regulations are the source of any harm to the Plaintiff.

situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir. 1980). Second, the Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges [(1)] that she has been intentionally treated differently from others similarly situated and [(2)] that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (*per curiam*) (hereinafter, an "*Olech* claim").

Here, as indicated in his opposition to Defendants' motion for summary judgment, Plaintiff brings an *Olech* claim against Defendants. Importantly, "*Olech* [claims] require[] an 'extremely high' degree of similarity between a plaintiff and [his] comparator[.]" *Hu*, 927 F.3d at 93. To prevail on an *Olech* claim, Plaintiff "must be *prima facie* identical to the persons alleged to receive irrationally different treatment." *Progressive Credit Union v. City of New York*, 889 F.3d 40, 49 (internal quotation marks and citation omitted). "More precisely, a plaintiff must establish that he and a comparator are *prima facie* identical by showing that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Hu*, 927 F.3d at 92 (internal quotation marks and citations omitted). "The purpose of requiring sufficient similarity is to make sure that no legitimate factor could explain the disparate treatment." *Fortress Bible Church v. Feiner*, 694 F.3d 208, 222 (2d Cir. 2012). "While that showing is generally a 'fact-intensive inquiry,' a court may nevertheless 'grant summary judgment on the basis of lack of similarity where no reasonable jury

25

could find that the persons to whom the plaintiff compares [him]self are similarly situated.'" *Pappas v. Town of Enfield*, 602 Fed. Appx. 35, 36 (2d Cir. 2015) (summary order) (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (ellipses omitted)).

"Where a plaintiff challenges a zoning decision, [he must] identify comparators who are similarly situated to [him] with regard to the zoning board's 'principal reasons' for denying the application." *Pappas*, 602 Fed. Appx. at 36 (summary order) (quoting *Fortress*, 694 F.3d at 223–24). "The Second Circuit and district courts in this Circuit have considered factors such as lot size, density of buildings, types of housing, temporal disparity, and composition of decision-making boards important for the determination of similarly situated." *Pappas v. Town of Enfield*, 18 F. Supp. 3d 164, 181–82 (D. Conn. 2014), *aff'd*, 602 F. App'x 35 (2d Cir. 2015).

The Court sets forth additional undisputed facts as germane to this claim. The Perkinses own property located at 8 Lark Road, which abuts the Plaintiff's property. (ECF No. 147-2 ¶ 49). On their property, the Perkinses have a single-family home and a single-story barn. (*Id.* ¶ 51). The Perkinses were granted a permit to build the single-story barn but were not required to go through the Conservation Commission before doing so. (*Id.* ¶¶ 53, 56). Nor were the Perkinses required to conduct any wetlands testing or soil testing. (*Id.* ¶¶ 56, 58). The Perkinses' permit was granted in 2013 when Lynn Charest was the Code Compliance Officer. (*Id.* ¶ 53). The state map relied upon to determine that there were wetlands on the Plaintiff's property also reveals that there is a narrow band of wetlands on the Perkinses' property located approximately 75 feet from the barn. (*Id.* ¶ 55).

In advancing his Equal Protection claim, Plaintiff alleges that the Perkinses "applied for and were granted a building permit for a structure almost the same size as the Plaintiff's proposed house in the same Inland Wetlands area and were not required to do any wetlands testing or make

any application to the Commission[.]" (ECF No. 141 ¶ 16). However, an examination of the record evidence reveals significant factual differences between Plaintiff's application to build a foundation for a single-family home on the Property and the Perkinses' application to build a barn on their property such that no reasonable jury could find that Plaintiff and the Perkinses were *prima facie* identical.

Significantly, according to the state wetlands mapping, there is only a small portion of wetlands soils on the southwestern portion of the Perkinses' property, which is approximately seventy-five feet from the barn. (ECF No. 147-2 ¶ 55). In contrast, Plaintiff intended to build his house on an area shown by the same state wetlands mapping to have a far greater swath of wetlands soils. (*Id.* ¶ 57). Moreover, Plaintiff's proposed home was intended to be much larger than the Perkinses' barn. Indeed, Plaintiff proposed to build a 2,715 square foot two-story single-family residence, (*id.* ¶ 62), whereas the Perkinses' barn is only 864 square feet (*id.* ¶ 51). Further, the Perkinses applied for a permit to construct the barn in April 2013 when Lynn Charest was the Town's Code Compliance Officer (*id.* ¶¶ 52–53), whereas Plaintiff submitted his application for a foundation permit in February 2015 when Glidden had replaced Charest (*id.* ¶ 53). *Pappas*, 18 F. Supp. 3d at 181–82 (noting that courts consider "temporal disparity" and the "composition of decision-making boards" when determining whether parties are similarly situated). Lastly, the Town received complaints concerning Plaintiff's application both prior to and at the ZBA hearing regarding the denial of his application (*id.* ¶ 37), while the Town did not receive complaints in connection with the Perkinses' application (*id.* ¶ 59). These significant differences between the Perkinses' application to build a barn and Plaintiff's application to build a foundation for a two-story home prevent a reasonable jury from concluding that the Plaintiff and the Perkinses were

*prima facie* identical. Accordingly, the Defendants are entitled to summary judgment as to Plaintiff's Equal Protection claim.[13]

Finally, in light of the Court's determination that the Equal Protection and Regulatory Taking claims fail as a matter of law, the Plaintiff's claims for Supervisory Liability also fail as a matter of law. *See Lawrence v. Evans*, 669 F. App'x 27, 28 (2d Cir. 2016) (summary order) (finding that supervisory liability fails when there is no underlying constitutional violation).

**Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment is granted. The Clerk of Court is directed to enter judgment in favor of the Defendants on Counts One, Two and Seven and to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 7th day of December 2020.

         /s/ Kari A. Dooley
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE

---

[13] In his Second Amended Complaint, Plaintiff alleges that the Town subjected him to differential treatment in other respects as well. For example, regarding the approval process for his septic system, Plaintiff alleges that "the State of CT health Dept. records for 5 years . . . show that no other similarly situated land owner was forced to take such measures in order to get septic approval." (ECF No. 141 ¶ 10). Such broad allegations, which do not otherwise identify a specific comparator, are insufficient to prove an *Olech* claim. *See Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) (dismissing claims where plaintiffs merely alleged, without providing specific examples, that the town-defendants refused to consider the plaintiffs' subdivision application while they considered applications submitted by those similarly situated).